In the matter of the application of the Mayor, &c. of New-York, relative to the *widening of* WALL-STREET.

On the 4th of June, 1851, a resolution was passed by the common council of the city of New-York, providing that Wall-street, on the northerly side, between Broadway and Nassau-streets, should be widened four feet, and that the counsel to the corporation should take the necessary legal measures therefor; *except* that the building on the corner of Nassau-street should not be required to be taken down until June 1, 1860. In May previous, the Bank of the Republic, the owner of the lot on the corner of Nassau-street, had contracted for the erection of a building upon the lot, and the same was erected, accordingly, during the summer and fall of 1851. In July, 1851, the supreme court appointed commissioners of estimate and assessment, without noticing the exception in the resolution, and the commissioners subsequently made a report, allowing to the bank the value of the *land* taken from it for widening the street, but allowing nothing for damages to the *building,* on the ground that it had been erected after the passage of the resolution for widening the street. *Held* that the report was erroneous, in not allowing for damages to the building; and an order made at special term, denying a motion to confirm such report, or to refer it back, on the ground that the resolution was void by reason of the exception, was affirmed.

There is no statute establishing permanently the lines or corners of streets in the lower part of the city of New-York.

The act which authorized the laying out of the upper part of the city, and the opening of streets there, and prohibited compensation to those who should build on the site of the streets then laid out, (2 *R. L. of* 1813, *p.* 414,) also authorized the corporation to extend, enlarge or otherwise improve any street

In the matter of widening Wall-street.

in the lower part of the city, but imposed no restriction on the right of the owners in that section to receive compensation for their buildings at whatever time erected. This, by implication, leaves to the owners in the lower portion of the city the general right to improve their lands when and as they please, until such lands shall be finally occupied by the public.

The corporation does not bind itself to adopt an improvement, either by passing a resolution to have it done, or by having commissioners appointed to carry it out; nor by any other act, short of a confirmation of the commissioners' report, by the supreme court. At any time previous to such confirmation the corporation may discontinue the proceedings.

The appointment of commissioners of estimate and assessment does not operate like a notice of *lis pendens*, so as to prevent an owner of land from going on to improve it, by erecting buildings thereon.

On the fourth of June, 1851, a resolution was passed by the common council of the city of New-York, that Wall-street, on the northerly side, between Broadway and Nassau-street, be widened four feet, and that the counsel to the corporation take the necessary legal measures therefor; except, that until June 1, 1860, the building on the corner of Nassau-street should not be required to be taken down. On the fifth of July, 1851, an order was made by the supreme court, on the petition of the corporation, appointing commissioners of estimate and assessment, and describing the widening, without noticing the exception, the court being of opinion that the exception was void. The commissioners made their report, containing, among other things, an allowance to the Bank of the Republic, situated on the corner of Broadway, for the land taken for the widening, but none for damages to the building thereon, the same having been put upon the land after the resolution for widening the street had passed the common council. The bank objected to the confirmation of the report. On the ninth of August, 1852, an order was made at a special term, declaring the report erroneous, because it did not allow for damages to the building, but denying the motion to confirm the report, or to refer it back, on the ground that the resolution was void by reason of the exception. The following opinion was delivered at the special term, by

ROOSEVELT, J. Had this case, in another form, been presented to the court at an earlier stage of its history, the great

In the matter of widening Wall-street.

embarrassment which now attends it might, I think, have been obviated. As soon as the common council, by the passage of a resolution or ordinance to that effect, had declared that, in their opinion, it was necessary or desirable, for the public convenience, to enlarge, straighten, or otherwise improve "the street in question," and in the language of the act, had " ordered and directed the same to be done," they acquired a legal right, inchoate, it is true, and conditional, but still none the less legal, " to take any lands, tenements, hereditaments, or premises whatever, for that purpose." It was a portion of the great right of eminent domain, belonging to every supreme legislative body, and delegated by the law of the state, in this instance, to the corporation of the city. This right to take and appropriate to the public use was accompanied by the duty on the part of the corporation to make, to the parties injured, a just "compensation and recompense." But if the duty or burden thus imposed upon the right might, at the mere will and pleasure of individuals, be aggravated by costly improvements to an indefinite extent, it is obvious the right itself would be wholly nugatory. Still the right exists, a right indispensable to all civil government. And where there is a right, there must be a remedy, and it is the duty of the courts to seek out and apply that remedy which shall be most appropriate.

What remedy more appropriate in the present instance than a preliminary injunction? An injunction, which, while it restrained the bank during the litigation from doing an act which, however lawful in itself, would and might "produce injury to other parties," could have been accompanied by a requisition of adequate security for the payment of all damages, including the loss of rent which the bank might sustain, by stopping their building and leaving the land unimproved, until it should be finally determined whether the projected alteration, still subject for months and perhaps years to the will and pleasure of the common council, would be actually consummated or not. Such an injunction, accompanied by a tender of such security, would have protected alike the right of eminent domain and the right of private property, both equally sacred in the eye of the law.

I am aware of a decision of the late court of chancery, made

in the matter of the widening of *Beekman-street*, seemingly ad-
verse to this proposition.   No security in that case, however, was
offered or suggested ; and no "code of procedure" was then in
existence.   The law, too, in that day, on the subject of injunc-
tions, as provisional remedies, was much less liberally expounded
than at present.   Thirty years have worked great changes in ju-
risprudence as in other things—antiquated prejudices, especially,
have been exploded—and the " prerogative writ," as the injunc-
tion was then called, has come to be considered a very ordinary,
every-day affair.   But who, it is asked, can give the security,
and to whom is it to be given ?   " The corporation, it is said,
cannot ; they have no interest in the improvement, and no power
to incur the obligation."   If the corporation, the legal repre-
sentatives of the public, have no interest in the improvement,
how can the measure be one of public utility ?   And if the land
to be taken be not taken for public use, how can it constitution-
ally be taken at all ?   The fact assumed in argument presents
in this view a serious difficulty ; and, from the papers, it would
seem to be not only an assumed but an actual fact ; for in the
report to the common council, on which their resolution was
founded, we find the following statement : " While those interest-
ed are asking for this improvement, your committee do not think
there exists any very great public necessity for its being made im-
mediately."   Have the corporation the right, at their discretion,
to divest a private individual of his property, merely to increase the
value of the property of another private individual ?   This will not
be pretended.   The right of eminent domain can only be exer-
cised when the public exigencies require it.   We must assume,
then, whether true or not, in order to sustain the present pro-
ceeding, that the corporation are acting for the public interest ;
and, if so, what can prevent, if necessary to the end, their con-
tracting a public obligation ?   The grant of a power carries with
it, by legal implication, every other power necessary or proper
to its due execution.   The corporation, therefore, could give a
valid security, and, if deemed proper, could require as a condi-
tion, from the parties specially desiring the improvement, a bond
of indemnity.   But the course suggested was not pursued ; no

In the matter of widening Wall-street.

injunction was applied for, no security of the kind indicated was offered, and the building, a costly structure, involving an expense of forty or fifty thousand dollars, was permitted in the eye of all, and without stay or interruption, to advance to its completion.

The question is, shall this edifice, the walls of which are not yet dry, be demolished; and if so, upon whom shall the loss occasioned by its destruction be made to fall? By the act of 1839, the corporation, previous to the confirmation of the commissioners' report, are authorized, in their discretion, to discontinue the proceeding. The same power also is in effect vested in the court, should it appear that the cost of the improvement will exceed the benefit. (*Matter of 4th Avenue,* 3 *Wend.* 452.) If the proceeding, in either of these modes, be not discontinued, it becomes necessary to determine the question of damage. The commissioners, to whom it was referred to estimate and assess the damage and benefit, have allowed to the bank, under the advice of counsel, as matter of law, but not, as it appears, in accordance with their own judgment, *no part of the cost of the building*. But they submit the question, as one of doubt, to the consideration of the court. If, then, the report, in its present form, be confirmed, the loss, whatever its amount, must fall upon the bank; if, on the other hand, the report, in this particular, be reversed, the burden of the assessments upon the parties to be charged, assuming the proceeding to go on, will be more than doubled. The hardship may be shifted, but cannot be escaped. Ought it, under the circumstances, to be imposed on the bank? I think not.

In arriving at this result, I have not adopted the argument of the counsel for the bank, although pressed with great force and ability, that the statute under which these proceedings are had, is unconstitutional. That statute was passed at a time (forty years ago) when the inviolability of private property, however recognized as a general principle, had not yet been clothed, except in cases of federal jurisdiction, with a rigid written constitutional sanction paramount to all ordinary legislation. The old notion of parliamentary omnipotence, derived

from our British ancestors, still lingered in the minds of states-
men and jurists. The government, under the notion of eminent
domain, might not only appropriate to its own use private prop-
erty, but might do so without restriction as to mode or time,
being limited only, as its advocates contended, by public require-
ment. (2 *Kent's Com.* 389.) It was the duty indeed of the sove-
reign to make just compensation, if convenient, at the time; if not,
whenever it should, in its own judgment, possess the ability—a
public moral duty binding only the sovereign will and conscience.
But feeling power and forgetting right, it sometimes like indi-
viduals disregarded these mere moral sanctions, and overleaped,
in the eagerness of pursuit, the bounds of justice. The mis-
chief was not in the power, but in the neglect to fulfill its ac-
companying duty. This mischief, it was seen, could only be
remedied by some stringent constitutional provision. Accord-
ingly, in the year 1821, the people of this state, copying the
very words of the federal instrument, inserted in their constitu-
tion, then newly adopted, the provision, "nor shall private
property be taken for public use without just compensation,"
and abrogated all such parts of the then existing common law
and acts of the legislature as were repugnant to this principle,
and the same provision was reaffirmed, in the same words, in the
constitution of '46.

Assuming, then, the street act to have been, in its origin,
constitutional, of which I have no doubt, we are now to inquire
whether, under the changes which have since taken place, it still
remains so, or in other words, whether the provision it makes
on the subject of "taking private property for public use" is
susceptible of being so executed as, upon sound legal principles,
to insure to the owner a "just compensation." It is contended
by the counsel for the bank, that compensation not made at the
time of taking the property, or before, but consisting merely in
a right to sue the corporation four months afterwards, is not
just compensation. That, it seems to me, must depend upon
the amount allowed. Suppose the commissioners, in making
" a just and equitable estimate" (as the law expressly not only
authorizes, but requires) " of the loss and damages to the re-

spective owners," had ascertained precisely what such "a right of action" against the corporation of the city of New-York would sell for in cash in the market, and had adjusted the amount to be·allowed, accordingly, would not such a compensation, regarding the matter in any fair business point of view, be deemed full, certain, and adequate? But, say the counsel, it is not ready money—it is not cash down—it is a mere right to sue. And what is nine tenths of all that we call property, but mere rights to sue? What are promissory notes, bonds and mortgages, bank bills, bank stocks, railroad stocks, insurance stocks, city stocks, state stocks—even government sixes—what are they all but rights of action? Some of them not even that. What is real property itself? a right to sue for rent or for trespass. Again, it is said, the commissioners are confined to the value of the land taken, and that, certainly, is not just compensation. I see no such restriction in the act, either in terms or by necessary implication; on the contrary it expressly directs them to estimate every species of "loss and damage," as well direct as incidental, as well "by" as "in consequence of" extending, enlarging or otherwise improving a street. In a word, whatever "a just and equitable estimate" may call for, they are authorized and enjoined, as part of their sworn "trust and duty,"·to allow. Whether it be the mere value of the land taken, or the interest on such value until the principal becomes payable, or any other element necessary to make good the owner's loss, he has a right, if he sees fit, to present to the commissioners his bill of particulars, and to ask their judgment on each and every of its items, and, if overruled, to appeal, as in other cases, from their judgment to. the judgment of the court. (17 *Wend. R.* 663.) What omission or provision is there in the law, which, on such appeal, precludes the court from executing the injunction of the constitution, and awarding to the party injured full, ample, liberal, of course "just compensation?" The court, before confirming the action of the commissioners, is required to hear *every matter*, "which may be alleged against the same," and may, if unsatisfactory, refer back the report, or send it to new commissioners, and may repeat this operation when and "as often as right and justice

shall require," until a report shall be made which it shall be proper to confirm. If there ever was a law marked by a scrupulous sense of justice, it is the one under consideration. It needs only to be executed in the spirit of the now venerable and distinguished jurist to whom it is indebted for its parentage, to insure for it the respect and good will of all who may have occasion to witness its results. Assuming, then, that the law as it stands, is adequate to the carrying out of the constitutional provision, let us see whether its requirements in the present case have been pursued.

The bank, some time before the commencement of these proceedings, with the view of providing a suitable location for its business, purchased the house and lot at the corner of Broadway and Wall-street; and, intending to erect a more elegant structure, immediately began the demolition of the old buildings. As soon as that operation was completed and the property thereby rendered unavailable till again built upon, the project of widening the street (a perfectly legitimate project) was started by several persons interested in the neighborhood. A question then arose : was the bank bound to suspend its original purpose, incommoding its business, and losing the interest on an outlay of $110,000, with no certainty that the proceedings would be consummated, and with no indemnity for the loss in case they should not, and a very doubtful indemnity in case they should? On the part of the corporation, there was no obligation to go on. Was there, then, on the part of the individual owners, any obligation to stand still? In the case of *Beekman-street*, before referred to, (6 *Johnson's Chancery Reports*, 46,) Chancellor Kent, after observing that "no rights were vested on either side," goes on to say : "The owners of property affected by the plan proposed, cannot compel the corporation to go on and carry the plan into execution. The corporation may abandon it at their discretion : and the question then arises, whether the rights of the parties be not reciprocal, and whether the corporation can, or ought to have a power in the mean time to control the individuals who may be affected by their meditated arrangement, from the use and improvement,

in their discretion also, of their own property." Suppose the corporation should elect to withdraw their application, or the court should deny their motion, the defendants would have sustained a loss by the interruption of their business, and suspension of their improvements, for which no compensation could be afforded." The chancellor accordingly in that case held, that the pendency of proceedings to widen the street, until they should assume the form of an order or judgment concluding all parties, created no obligation on the owners to desist from "the usual and ordinary enjoyment of property to which they had an absolute title."

At a subsequent period, as late as 1840, another injunction case, in a different form, came up for review on appeal before Chancellor Walworth; the case of *Meserole* v. *The Corporation of Brooklyn*, reported in 8 *Paige*, 208. In that case, after discussing some other points, not necessary to advert to, Chancellor Walworth observes: "As I understand the recent decision of the supreme court, in the matter of *Anthony-street*, (20 *Wend.* 618,) there cannot be an absolute confirmation of the report of the commissioners of estimate and assessment, so as to give any vested rights, under the same, until the damages for all the lands taken for the proposed improvement have been ascertained and settled, and are properly assessed upon the owners of those lands which will be benefited by the improvement." To deny to an owner the free enjoyment of his property in the only mode in which it could be enjoyed, as in this case by building on it, and to do so from considerations of possible or probable public advantage, expected to be realized, and that too for a period of indefinite duration, is to that extent as much and as truly a taking of private property for the public use, as if the entire fee simple were assumed. And if the street law, as now contended for, requires a construction leading to such a result, and at the same time secures to the owners no just compensation, it is clearly, in that particular, unconstitutional and void. The court, however, unless compelled, will not so construe a statute as to make it void. As in the case of private laws, if there be two possible meanings, the valid will be taken and the

void rejected. I shall assume, therefore, either that the legislature, as decided by Chancellor Kent, did not intend to control the free right of the private owner until the confirmation of the final report, or that they did intend that if controlled, he should be fully compensated for his loss.

The decision of the late supreme court in the matter of opening *Furman-street* in the city of Brooklyn, (17 *Wend.* 649,) has been cited by the counsel on the part of the corporation, as an authority at variance with the views above expressed. Its spirit and tendency, at first view, are certainly of that character. In the opinion delivered by the learned judge who was the organ of the court, the public appears to be every thing; the individual nothing. Sixteen years, however, of subsequent reflection and experience, have changed his views. He now stands forth as the champion of private property, contending as counsel for the bank, that the public interest is best promoted by a rigid observance of individual rights; while on the other hand, his judicial brother, who, thirty years ago, as strenuously, and as successfully too, stood up for the maintenance of individual rights, is now the advocate of eminent domain. In this position of the question as matter of authority, I may without presumption be permitted to dissent, in some degree at least, from the learned judge's reasoning in the Brooklyn case, and to say, with its author, "that case has been much doubted." (*Seaman* v. *Hicks*, 8 *Paige*, 660.) But whether it be good law or not, I agree with him in insisting "that no sensible man can read the case, without seeing that it is wholly different from this in point of principle." In that case, the width and course of the street had been permanently designated by an act of the legislature; in this, the designation was by a mere resolution of the common council, not to be final or binding, unless they should be satisfied with the report which the commissioners might make. In that case, "the act was passed and the map filed," as the judge observed, at a time when the provision on which the objection of unconstitutionality is based, that private property shall not be taken for public use without just compensation, "was not contained in our constitution, at a time when,

In the matter of widening Wall-street.

if the land was in truth appropriated to public purposes, there was nothing in the constitution to forbid such a course, however injurious it may have been to the owners;" in this case, the resolution of the common council, which is the first step in the appropriation, was passed since, and subordinate to, the constitutional injunction. In that case, the land at the time was, or at least was assumed to be, a farm, used for agricultural purposes ; in this, it is a city lot, which can only be used by being built on. In that case, the owner, it was assumed, could, without building, enjoy his land in the way in which such property is usually enjoyed ; while here, without building, the owner could make no use of it at all. And to sum up, in a word, the whole contrast : in that case the court say, " Admitting that the privilege of erecting buildings on the land could not be taken from the owners without a reasonable recompense, it would not be doubted for a moment that they had received this recompense, and that too, many times over." Whereas, here it is conceded, or, if not, it is abundantly proved, that the bank neither has, nor could have, received any recompense whatever. These distinctions, it seems to me, are sufficient to warrant the court, so far as the Furman-street decision is concerned, in treating the subject as an open question. They are not now taken for the first time. More than ten years ago their force was judicially recognized in another Brooklyn case, (*Seaman* v. *Hicks*, 8 *Paige R.* 656,) on appeal from the vice chancellor of the first circuit. The decision of the vice chancellor was affirmed in 1841. The purchaser at a master's sale had refused to take the title, alleging that part of the premises sold were within the lines of Columbia-street, as laid down on the map of Brooklyn, and that a portion of the buildings standing on that part had been erected since the filing of the map. " It becomes absolutely necessary, therefore, (says Chancellor Walworth,) that I should examine the question, as to the existence of the supposed right of a corporation to take a part of the premises for such an extension of Columbia-street, without paying to the owner of the land the damages which he will sustain by the destruction of the buildings which shall have been erected thereon subsequent to the filing of the map of April,

1819.   In the case of the opening of Furman-street, (he continues,) Mr. Justice Bronson came to the conclusion that the 18th section of the act of April, 1816, (the street act of Brooklyn,) by necessary implication deprived the owner of property designated upon the permanent plan of the village as the intended site of a future street, of all claim to compensation for the removal or destruction of buildings which should be erected thereon, subsequent to the filing of the map, which the trustees were directed to make. Such may have been the intention of the legislature in relation to property, which was so situated that the prospect of the opening of the streets through the same at some future time, and the immediate location of such streets, according to a settled plan, would be of more actual benefit to the owners of the residue of such land, than the present use of the part of the land thus appropriated for future streets would be worth for building purposes, or other permanent improvements, until it should become necessary to open the streets and pay the owner for the value of the land actually taken, without reference to such improvement. I think, however, the position cannot be maintained, that where an individual has a single vacant lot, in a city or village, which lot is of great value for building purposes, and worth little or nothing for any other use, the legislature may authorize the corporation to appropriate such lot prospectively to be opened and used as a street at its unimproved value, and to be paid for at some future period when the corporation shall think fit to order such street to be opened ; thereby depriving the owner of the whole beneficial use of his lot for an indefinite time without any equivalent whatever for the damage he must sustain, in consequence of being deprived of the power of building upon or otherwise improving the lot." " Until the report is confirmed," say the counsel for the corporation, " the owner of the land acquires no title or right to compensation or damages. And does not this negation on him imply a corresponding negation on them ? If he cannot claim, how can they control ? If he gets no right to their compensation, how can they get a right to his land ? The rights, to be just, must be mutual ; and to be constitutional, they must be "just." Indeed, the counsel admit,

In the matter of widening Wall-street.

that until the final confirmation of the commissioners' report the title to the land continues in the owner, and that he has the full and absolute right to the use of it in any way and for any purpose needful to himself; but then such purposes must not be injurious to others, nor inconsistent with the lawful appropriation of the same by competent authority to the public purpose of a street.  He has all the rights and powers of ownership, and is not deprived of any privilege whatever in relation to the beneficial enjoyment of his land; but he must not build upon it.  Such language addressed as in this case to the owner of a city lot, appears very much like mockery.  It is much the same as saying to a starving man, you have the full and absolute right to that loaf of bread, but you must not eat it; or to a weary, worn-down traveler, you have all the rights of ownership in that horse, except to ride or drive him.

The corporation, in these cases, although acquiring, as I conceive, an inchoate, contingent interest, sufficient, with the tender of security, to warrant an injunction for its protection, obtain no absolute, vested title, until the final confirmation of the commissioners' report; when, as the act expressly provides, " they become seised in fee of all the lands, &c., which shall or may be required for the purpose of extending, enlarging, or otherwise improving the street," and absolutely bound to pay the equivalent required by law.  The bank, therefore, in my judgment, had a perfect right until such confirmation, which even still is uncertain, to go on, and improve and use their property in the manner originally contemplated; and having done so in good faith, they cannot now be deprived of either the ground or superstructure, for public use, or to promote the interest of others, without an indemnity to the full extent of all their loss by or in consequence of the alterations to be made.  This, of course, would include the cost of taking down a large portion of the building and reconstructing it on the new line, and the diminished value of the amputated structure, compared with that of the present well proportioned edifice.  Nor could the loss of rent and of business be overlooked in " a just and equitable estimate."

A question of what is called dedication has also been raised by

some of the parties assessed, growing out of the following state of · facts : About seven years ago, the owners of several of the inner lots on the north side of Wall-street, between Broadway and Nassau-street, erected new buildings thereon, setting them back four feet from the line of the street. This, it is contended, was an act of dedication to the public, and that the parties cannot now claim an allowance as for the taking of those same four feet. The law of dedication rests upon intention, express or implied. Such intention may be evidenced by a written instrument conveying the right in terms, or by the acts or acquiescence of the party, from which a relinquishment may be fairly inferred. (6 *Wend.* 656. 8 *Id.* 105. 5 *Watts & Serg.* 141. 2 *Ashmead*, 211. 5 *Denio*, 19. 11 *East*, 374.) Clear, unequivocal, adverse user by the public, acquiesced in for a period of twenty years, is conclusive. A much shorter period, with strong accompanying circumstances, may be sufficient. Here, there is not only no deed, and no twenty years' user, but the circumstances relied on as a substitute lead to the opposite conclusion. The steps and the areas of the buildings cover the whole four feet, and lest that should not be sufficiently unequivocal, the areas have been carried out nearly as many feet more. The whole space, of four feet by about one hundred and thirty, is also flanked by projecting buildings, and neither has been, nor can be, made a general thoroughfare. It forms a sort of *cul de sac*, created for the benefit of these six particular stores, or rather for the separate benefit of each, and the utmost, it seems to me, fairly to be implied from its construction, would be that each owner, when building upon the common plan, had bound himself to his colleagues not to advance again to the former line, without the consent of all.

This doctrine of dedication by inference, like that of compensation, has been carried quite far enough. They are both, in principle, violations of the right of private property, under the pretense, too often merely assumed, of public good. The owners of these lots, therefore, if the widening of the street takes effect, are entitled to an allowance for the four feet diminution in their depth. But in estimating the amount of damage, the value of rear and not front ground, should be taken as the guide ; and the

same standard, so far as respects the soil, should be applied to the four feet diminution in the northerly depth of the bank lot. Both, too, while allowed for damage, should be fairly assessed for benefit. The individual owners have been : the bank, for some reason unexplained in the commissioners' report, has not. Although widening the street, as a cartway, may be of no service to the bank, yet widening the sidewalks for pedestrians, it is obvious, must very much enhance the whole value of all basement accommodations."

From the order entered in accordance with this opinion, at the special term, the corporation of New-York appealed.

*R. J. Dillon,* for the corporation. I. Whether the exception in the resolution directing the improvement, made the resolution void, is a question of *jurisdiction ;* and the determination of the common council might have been reviewed by a common law *certiorari.* And the decision of the court, on appointing commissioners, that the resolution was valid, might also have been reviewed. The assertion of jurisdiction by the common council having been acquiesced in, the bank is concluded. The decision by the court, affirming the jurisdiction, also concludes the bank. The question is *res adjudicata.* (*Ex parte Mayor of Albany,* 23 *Wend.* 277. *Starr* v. *Trustees of Rochester,* 6 *Id.* 564. *In the matter of Albany-street,* 11 *Id.* 150. *In the matter of John and Cherry-streets,* 19 *Id.* 659. *In the matter of William and Anthony-streets, per Bronson, J., Id* 681. *In the matter of Mount Morris Square,* 2 *Hill,* 26, 28.) II. The bank having acted under it, and nominated one of the commissioners of estimate and assessment, is estopped to deny the validity of the resolution; and the only question before the court, on the motion to confirm, was the validity of the report of the commissioners. III. The resolution was valid. (1.) If the exception was an essential component part of the resolution, then the widening was of so much of the street only as was not opposite to the excepted building. The common council had authority to widen as much of the street as it should judge

proper. (2.) If the exception was not an essential component part of the resolution, it should be rejected, as repugnant to the resolution, and therefore void.   It is a settled rule in the construction of statutes, that a saving clause, repugnant to the body of the act, is void.   (*Alton Wood's case*, 1 *Coke's R.* 47.)   IV. The damage to the building of the bank was properly disallowed.   It was put up after the widening was ordered, and in defiance of the common council.   The bank placed it there in its own wrong ; and to give compensation for it, would be giving it an advantage by means of its own misconduct.   Such a rule would put a weapon into the hands of objectors fatal to public improvements.   (*Matter of Furman-street*, 17 *Wend.* 649, *in* 1836 ; *S. C. in Ct. of Errors, in* 1842. *Jackson* v. *Mayor of Brooklyn ; Hicks* v. *Mayor of Brooklyn, in Court of Errors, December*, 1843.)   V. The report, therefore, should have been confirmed.   But even if it had been erroneous, the least that the court should have done, was to refer it back to the same, or other commissioners.

*G. N. Titus,* for the Bank of the Republic.   I. The order made in this matter, at special term, is not appealable.   (1.) It was not made *in a civil action,* nor in a proceeding supplementary to an execution.   (*In re. Fort Plain and Cooperstown Plank Road Company*, 3 *Code Rep.* 148.   *Code of Proced.* §§ 323, 8, 349, *and note.*)   (2.) In this district motions for the confirmation of the report of commissioners of estimate and assessment in street cases, are directed by law to be made at a *special term* of this court.   (*Sess. Laws of* 1839, *p.* 182, *chap.* 209, § 1.)   II. The mayor, aldermen and commonalty have *no right* of appeal from said order, if it is appealable.   It was made in a special proceeding, instituted for the purpose of taking land for a public street.   At the *present stage* of that proceeding they have acquired *no right* to, or interest in, that land ; they cannot acquire such interest until the confirmation of the report of the commissioners.   (*Rev. Laws of* 1813, 2d *vol. pp.* 413, 414.   *In the matter of Anthony-street*, 20 *Wend.* 618.) III. The order appealed from is not erroneous, if it be assumed for the present that the court acquired jurisdiction in this mat-

ter by the resolution of the common council, approved by the mayor on the 4th June, 1851. The Bank of the Republic had an *absolute legal right*, as the *owner* of the land at the corner of Broadway and Wall-street, to erect thereon its banking house, which *is* as much its *private* property as the land on which it stands, and *must continue* so until it be *taken* for public use, according to law, and just compensation be made therefor. There was and *could be no order* of the common council ·restricting or impairing such *legal right*, in the remotest degree, by way of notice or otherwise. Until that land shall have been *so taken*, and just compensation shall have been made therefor, the *private* right of the Bank of the Republic to make improvements thereon, and to the use and enjoyment of such land and improvements, could not and cannot be encumbered with any restriction or qualification whatever, even by the highest legislative power of the state representing the right of *eminent domain ;* nor could nor can its *claim* and *right* to just compensation for loss and damage in respect to its banking house, which must be destroyed if the proposed widening of Wall-street should ever take place, be defeated or impaired. That just compensation means *full indemnity* for such loss and damage, *direct* and *consequential.* (*Rev. Laws of* 1813, *vol. 2, p.* 414. *The People* v. *Corporation of Brooklyn,* 1 *Wend.* 318. *In the matter of Canal-street,* 11 *Wend.* 154. *In the matter of Anthony-street,* 20 *Wend,* 618. *Sess. Laws of* 1839, *p.* 182, § 1; *p.* 185, § 7. *Art.* 1, §§ 6, 7, *of the State Constitution. Hooker* v. *New Haven Co.,* 14 *Conn. R.* 146. *Matter of the City of Pittsburgh,* 2 *Watts & Serg. R.* 320. *Gardner* v. *The Village of Newburgh,* 2 *John. Ch. R.* 162. *Varick* v. *Smith,* 5 *Paige's Ch. R.* 146, 147, 159, 160. *Corporation of N. Y.* v. *Mapes,* 6 *John. Ch. R.* 46. *Seaman* v. *Hicks,* 8 *Paige R.* 656.) Until the confirmation of the report of the commissioners of estimate and assessment, the corporation may discontinue all proceedings relative to this improvement, at their pleasure, without making compensation to any person affected by it. While the Bank of the Republic, *until then,* "a period of indefinite duration," if deprived of the right in the interim to improve

In the matter of widening Wall-street.

and use its land, " in the only mode in which it could be enjoyed," has no compensation made or *secured* to it *by law*, for any loss or damage sustained thereby. (*See cases and statutes last cited.*) Any law which takes from the *owner* of land that *right*, without making just compensation *therefor*, is unconstitutional and void. IV. The statute under which these proceedings were taken, though it may have been valid when enacted in 1813, is repugnant to the existing constitution of this state, which declares that private property shall not be taken for public use without just compensation. The statute provides that private property may be taken without the consent and against the will of the owner; that the corporation shall become and be seised in fee of such property, on the final confirmation of the report, and may immediately take possession of it for public use, without making any compensation for it before or when it is so taken. It exempts the corporation from any obligation to pay such compensation for four months after it invests them with the title, and gives them the power of taking possession of the property. It makes no certain or adequate provision for the payment of such compensation at any time. It gives to the owner from whom the property is taken, nothing but a right of action against the corporation for his compensation, and does not even give him that, until after the expiration of four months from the confirmation of the report, and then only after having made previous application for payment; and it provides that he shall not be entitled to interest for any period during which he may have been deprived of his property anterior to such application. This is neither just compensation nor compensation in any sense. V. The supreme court has never acquired jurisdiction in this matter; and its order for the appointment of commissioners of estimate and assessment, was made without legal authority. (1.) The record of the proceedings of the common council shows that, in THE OPINION of the mayor, aldermen and commonalty, *it was not necessary for the public convenience* that Wall-street should be widened *from Broadway to Nassau-street at the time* the resolution was passed. (2 *Rev. Laws of* 1813, § 117, *p.* 409.) (2.) The mayor, aldermen and commonalty have not,

In the matter of widening Wall-street.

(as required by the act of April 9th, 1813,) *ordered* and *directed* that Wall-street should be widened four feet on the northerly side thereof, *the whole distance* between Broadway and Nassau-street. (*Thatcher* v. *Powell*, 6 *Wheat. R.* 119. *Sharp* v. *Spear*, 4 *Hill*, 76, 86.) (3.) The resolution of the common council, approved by the mayor on the 4th June, 1851, *was void* by reason of the exception therein contained, as to the building on the corner of Wall and Nassau-streets. The said resolution declared, in effect, that Wall-street *should* be widened four feet on the northerly side, from Broadway to Nassau-street, and that it should *not* be so widened. It was not a distinct and unconditional order or direction that Wall-street should be widened for the whole distance, or for any certain and specific distance, between Broadway and Nassau-street ; and the common council had no power to make any other than such a distinct and unconditional order and direction. (*People* v. *Judges of Suffolk Co.*, 24 *Wend.* 249. *Davison* v. *Gill*, 1 *East*, 64, *cited in* 20 *Wend.* 249.) (4.) If the said resolution was valid as an order and direction of the common council for the widening of Wall-street, in any respect, it was not for *such* widening of Wall-street as the said commissioners were appointed to make an estimate and assessment for, or as is embraced in the estimate and assessment reported by them. (5.) A *jurisdictional* objection may be taken at any stage of a suit or proceeding. (*In the matter of Wrigley*, 8 *Wend.* 134. 2 *U. S. Digest, Jurisdiction, p.* 675, § 31. *Stamps* v. *Newton*, 3 *How. Miss. R.* 34. *Stoughton* v. *Mott*, 13 *Verm. R.* 175. *Delafield* v. *The State of Illinois*, 2 *Hill*, 159. *Latham* v. *Edgerton*, 9 *Cowen*, 227.) VI. If the above *constitutional* and *jurisdictional* objections should not prevail, it is insisted that the report of the commissioners should not be confirmed, but that the order appealed from should be affirmed, so far as it adjudged that the said report was erroneous, because "no compensation was thereby estimated or allowed to the bank for damage to their building." (1.) It appears on its face that the compensation and recompense, allowed and estimated by them to the Bank of the Republic, was *only* for the value of the land of the said bank, taken for the said

widening of Wall-street.   (2.) It also appears thereby, that such allowance and estimate were so made, *not* upon the judg-ment of the commissioners, but because they had been advised by the counsel of the corporation that the bank was entitled to compensation and recompense for the value. of such land only. (3.) It was not the duty of the commissioners, but contrary thereto, to have acted upon any such advice.   (4.) Such advice was erroneous, and the commissioners were misled thereby. (5.) The commissioners required and asked the order and direc-tion of this court upon that point, to the end that after having received such order and direction, they might be governed there-by ; thus admitting that their estimate and assessment was un-finished and incomplete.   (6.) It was in proof before the court, that *two* of the said commissioners were of opinion that the Bank of the Republic was entitled to compensation for the dam-age to be done to its building; and the estimate and assessment presented to the court was, in fact, the estimate and assessment of *one* commissioner only, and not of all.   (7.) Such two commis-sioners, being of that opinion, should not have joined in making such estimate and assessment, but should have made one accord-ing to their own judgment of the law, and their own sense of the right and justice of the case, and have reported the same to the court.   (8.) It was in proof before the court, that they were prevented from so doing by the advice of the counsel of the cor-poration, that it was necessary that all three of the commission-ers should join in making any such report.   (9.) Such advice was erroneous, and the said commissioners were misled thereby. (*Act April 9th*, 1813, § 188.   2 *R. S.* 555, § 27.   *Green* v. *Miller*, 6 *John. R.* 39.   *Yates* v. *Russell*, 17 *Id.* 468.   *Hopkins* v. *Flynn*, 7 *Cowen*, 526.   *McCoy* v. *Curtice*, 9 *Wend.* 17. *Downing* v. *Rugar*, 21 *Id.* 178.   *Crocker* v. *Crane*, 21 *Id.* 211.   *Woolsey* v. *Tompkins*, 23 *Id.* 324.   *Oakley* v. *Aspin-wall*, 3 *Comst.* 547.)

*By the Court*, MITCHELL J.   On the 4th of June, 1851, a resolution of the corporation of New-York was approved by the mayor, which directed that Wall-street, on the northerly side,

between Broadway and Nassau street, be widened four feet, *except* that until June 1, 1860, the building or any part of it on the corner of Wall and Nassau streets, on the north side of Wall-street should not be required by the corporation to be taken down, but that the same should remain until that date as it was at the date of the resolution. In July of the same year a petition was presented, under the corporate seal of the city, to the supreme court at special term, for the appointment of commissioners of estimate and assessment. At that time it was agreed that the exception in the resolution was void, and that opinion, was expressed by the judge then presiding. No order on that subject was entered; but probably to conform to that opinion the petition as now on file, and the order entered thereon; omit the exception entirely. The order was entered July 28, 1851, though dated on the 5th of that month. The commissioners made the necessary affidavits and took the oath of office on the 29th of July and 1st of August, 1851. The map showing the property to be taken was not completed until September 17, 1851, and the map of property benefited not until the 27th of October, following. The commissioners made their report, and deposited it for examination, on the 19th of December, 1851; and they, disregarding the exception contained in the resolution of the corporation, reported on the lot at the corner of Wall and Nassau streets, as if it was immediately to be taken and the building removed, and awarded to the owner of the fee, for taking the land and taking down the building on the part of the lot to be taken, and for loss of rent of that part from May 1, 1852, $9829, and awarded to the lessees, for their injuries from May 1, 1852, various sums. Objections were presented to this report, and among others by the Bank of the Republic; the commissioners (as their report shows,) having allowed the bank the value of the land taken from it, only, and not the value of the building upon it. The commissioners acted in this contrary to their own judgment, but under the advice of the corporation counsel.

The bank contracted to purchase this lot of ground, with the buildings then on it, January 31, 1851, for $110,000, and made

the first payment on the 22d of February, following. On the 1st of May they obtained possession of the lot, and began to pull down the old building. On the 14th of the same month they made a contract in writing with J. L. Taylor, to do the carpenter's work of their new building, and to complete it by the 1st of November, 1851. The brown stone-masons were to complete their work by October 1, 1851. The ordinary mason made his contract on the 16th of May, and was to complete his work by the 15th of October. On the 28th of July, 1851, the building had been erected to the upper part of the first or principal story above the basement; on the 21st of August, up to the second story; on the 17th of November, up to the attic or fifth story. The cost of taking down this part and making the necessary alterations would be, probably, between eleven and twenty thousand dollars. But for this cost the commissioners make no allowance.

As the map of the property to be taken was not made until the 17th of September, the commissioners could not have begun to estimate the damages to the respective owners before that time. The map was essential to show them how much was to be taken from each owner, and how it would affect the rest of his property. The commissioners could hardly view the lands to be taken, until a survey should show what was to be taken; and by the act under which they proceed, they are required " *after* having viewed the premises," and *after* causing surveys, &c. to be made, to proceed and make a just and equitable estimate and assessment, (§ 178, *p.* 410.) By the 28th of July, when the order appointing the commissioners was first entered, the building had been erected to the upper part of the first story above the basement; and by the 21st of August, and before the commissioners could have commenced their estimates, it was erected to the top of the 2d story; and by the 17th of September, when they might have began, it was probably erected to the top of the 3d story. Yet it was insisted that for all this value, which was not placed on the property in opposition to any law, the bank was entitled to no compensation.

A somewhat similar case occurred in the matter of opening

In the matter of widening Wall-street.

*Bloomingdale Square*, where no buildings were erected ; and it was contended that the property was condemned to the use of the public as of the year 1807 when the act for laying out the city was passed, or as of the year 1811 at the latest, when the map laying out the plan of the city was filed and made public, and that the owners of the square were to have only the value of the lands as it was at one of those years, with interest, and not to have the benefit of any subsequent increase in its value. The court, at general term, (March, 1853,) said that the present value of the land was to be allowed ; to be estimated to all the owners as of the same day for all, and that day to be about the time of the completion of the report. And as there had been a great apparent enhancement of prices within a few years before that date, the court said that the commissioners were not to take as the present value prices far exceeding what could have been obtained at any time within ten years before the last year, unless they considered those enhanced prices the fair and probably permanent values of the land ; that the owner was not limited to or entitled to the value in 1811, with compound interest on it, as a sale ; but was to have the enhanced value which his property had derived from the permanent plan and settlement of the city ; and that this enhanced value was presumed to compensate the owner for the loss occasioned by the prohibition to build since the year 1811. And the case of *Furman-street*, (17 *Wend.* 649, 658, 660,) was referred to, where the commissioners had acted on this principle, and their report was adopted.

The principle adopted in this case was that neither the value of property when the law condemning it to the public use was passed or took effect, nor when the land was specially ordered to be taken, nor when the commissioners to estimate its value were appointed, was to be the rule of estimating damages ; but the permanent value about the time of the completion of the report. The act referred to, shows that this last period, or one near it, is the correct one ; for it directs the commissioners "*after having viewed*" the lands, tenements and premises, and "after causing all surveys, maps, profiles, plans and other things as they may judge necessary, to be made," then to proceed and make a just and

---

---

equitable estimate and assessment of the loss and damage over and above the benefit and advantage to the respective owners, &c. interested in the lands, tenements and premises by or in consequence of the opening, &c. They are required to view the premises, that is, to see them as they are when they view them, and to have surveys, maps, profiles and plans made of them, at the same time. That is also for the purpose of exhibiting them as they then are, and not as they were at any former time; and then, after obtaining these helps, which furnish means of determining the value of the lands as of the time when they are to be estimated, and not as of any prior time, the commissioners are (with those lights and those only, so far as the statute expressly requires) to proceed and make a just and equitable estimate of the loss and damage to the respective owners. There is no provision for the commissioners discovering the value as of any prior date, whether that be the date when the resolution to take the lands was passed, or when the commissioners were appointed. And if the value at either of those periods were taken, the estimate of the commissioners would not be a just and equitable assessment of the loss and damage.

In this case the bank did tear down a costly building which was on their lot; and this was not done until after the first of May. If they had delayed this work of destruction until the day after the resolution to widen the street had been passed, or the day after the commissioners were appointed, and the commissioners began their estimates a month after the destruction was completed, does any one suppose that the commissioners ought to have allowed the bank for the value of that part of the old building which had covered these premises? Or if a storm, or fire, had destroyed the old building, at the time supposed, would the commissioners then have been bound to allow for its value? If they were not to adopt a value prior to the time of the estimate when it would favor the owner, they should not adopt it when it would injure him.

The cases of *Jackson* v. *The Mayor of Brooklyn*, and of *Silliman and Hicks* v. *The Same*, decided in the court for the correction of errors in December, 1843, and affirming the decision

in the *Matter of Furman-street*, (17 *Wend.* 649,) have been referred to, to show that the bank had no right to build, after the order appointing commissioners, or after the resolution of the common council to widen the street. It is not argued that a precisely similar point was decided, but that the principle involving that point was decided. Both of those cases arose under an express statute relating to Brooklyn; and the points decided in the supreme court were, first, that the act passed in 1816, relating to the then village of Brooklyn, and which required the trustees of the village to cause to be made a plan of the village, exhibiting the streets, roads and alleys *to be permanently laid out*, and to cause the map to be kept by the clerk of the village, subject to the inspection of any inhabitant, "*in order* that no resident might plead ignorance of the permanent plan to be adopted for opening, laying out, leveling and regulating the streets of the said village," (*Laws of* 1816, *p.* 95, § 17,) clearly intended to prohibit, from the time the map should be made and filed, any owner from building on the site of any street laid out on the map, except at the risk of not being paid for such building; 2dly, that such prohibition was constitutional, and that it did indirectly provide full and adequate compensation to the owner, for the limited prohibition to build in the increased value given to the adjoining lands by the conversion of country farms into parts of well and permanently regulated village lots, soon to become valuable city lots. Without such permanent regulations none of the property would so rapidly increase in value; and by them the land forming the site of the street would become, and in that case had become, far more valuable than the value of the land when the law was passed, with compound interest added to it. For these reasons the supreme court held the law constitutional and valid, and the court for the correction of errors affirmed that decision.

In like manner the act relating to the city of New-York, (2 *R. L. of* 1813, *p.* 414,) provided that no compensation should be made for any buildings which, at any time subsequently to the filing of the maps of the upper part of the city, should be erected on any street or public square designated on that map. In each

of these cases there was an express statute which was held clearly to prohibit any building after the permanent plans of the village or city had been adopted and published and the maps filed and placed before the public, so that they could not plead ignorance of them.

In the lower part of the city there is no statute establishing permanently the lines or corners of streets. The same act which authorized the laying out of the upper part of this city, and the opening of streets there, and prohibited compensation to those who should build on the scite of the streets then laid out, also authorized the corporation to extend, enlarge, or otherwise improve any street in the lower part of the city, but imposed no restriction on the right of the owners in the lower part of the city to receive compensation for their buildings, no matter when they should be erected. This, by implication, leaves to the owners in the last case the general rights to improve their lands when and as they will, until those lands shall be finally occupied by the public.

The public do not bind themselves to adopt an improvement, either by passing a resolution to have it done, or by having commissioners appointed to carry it out; nor by any other act short of a confirmation of the commissioners' report by the supreme court. At any time before that confirmation the corporation may discontinue the proceeding. (*Matter of Canal-street*, 11 *Wend.* 154. 20 *Id.* 618. 18 *John.* 546.) How unjust it would be to require every owner to refrain from building on his own land, or to conform his new building to a plan merely proposed by the corporation, when the proceedings might be delayed (as the Canal-street extension has been) for several years, and when the corporation might on its own will then abandon the improvement, after the new building had been made to conform to the proposed plan. In this case the corporation could have discontinued the proceeding at any time before its final confirmation, and in the same period, even against the will of the corporation, the proceeding could be as effectually stayed by a majority of those interested expressing their dissent to the report. Thus the character of fixedness and permanency which was given by

the statute on the filing of the map, to the streets in the upper part of the city, and in the Brooklyn cases, does not exist as to streets in the lower part of the city, until the report is confirmed. The restriction as to the use of the scite of the streets in the upper part has the authority of a statute, (the supreme law of the state,) and is founded on an indirect compensation. The attempted restriction in the lower part of the city has no such high authority as a statute to support it, but an implication in the statute against it; has not even a resolution of the corporation to prohibit the use of the site, and is founded on no compensation, direct or indirect.

It is not surprising that a natural sense of justice led two of the commissioners to revolt at the idea of subjecting an owner to such injustice, and that they yielded only on account of the advise of counsel.

In the case of the *Corporation of New-York* v. *Mapes,* (6 *John. Ch. Rep.* 46,) Chancellor Kent refused to grant an injunction to prevent Mapes from building on lands proposed to be taken by a resolution of the corporation, on the ground that no rights vested until the report of the commissioners should be confirmed; and he said, "the plaintiffs may perhaps have to pay for the value of the buildings now erecting by the defendants. This is all the inconvenience or loss that the plaintiffs can sustain, and would it not be *damnum absque injuria?* It is a loss which the court cannot prevent without a dangerous and unprecedented interference with the enjoyment of private right. As the case stands, the plaintiffs have shown no right or title, or *raised any equity,* which can be a ground for an injunction, or by which I am authorized to *control the defendants in the usual and ordinary enjoyment and improvement of property* to which it is assumed they have an absolute title." (*Id. pp.* 50, 51.)

It was said that this was a proceeding *in rem,* and that the appointment of commissioners operated like a notice of *lis pendens.* The analogy would not favor the appellants. If, in a suit to foreclose a mortgage, a notice of *lis pendens* be filed, it does not prevent the mortgagor from going on to improve his property by erecting buildings on it, under any penalty, (like that assumed

in this case,) that if the lands be taken from him by a sale he shall be allowed nothing for the new buildings. Nor does the commencement of a foreclosure suit, *e converso*, compel the mortgagee, when the lands are sold, if he buys them, to pay for improvements which were on the lands when the action was commenced, but which have since been burnt down or otherwise destroyed. The *lis pendens* does not prevent parties exercising rights which they had, before suit brought. The court may in peculiar circumstances so far anticipate their judgment as to interrupt those rights; but this is by special order only.

It seems to be understood that the corporation have no desire to continue the proceedings, unless the bank shall be compelled to go without compensation for the building. That makes it unnecessary to inquire whether the commissioners' proceedings are void, as contrary to the resolution of the common council. If the corporation had such desire, it might be necessary to go into this last inquiry also; as then the proceedings should go back to the commissioners to be corrected.

Order of the special term affirmed, with costs.

[NEW-YORK GENERAL TERM, May 1, 1854. *Mitchell, Roosevelt* and *Clerke,* Justices.]