# Cases

# FIRST DEPARTMENT,

AT

# GENERAL TERM.

## March, 1883.

---

IN THE MATTER OF ERASTUS H. MUNSON.

29  325
24ap 10
29  325
40ap284

*Taking of land for public purposes — value of the land — at what date the value is to be determined — right of the State to discontinue the proceedings — act authorizing the payment of losses occasioned to the property owners by reason of the exercise of such right by the State — upon what principle such losses are to be ascertained — closing of streets — 1871, chap. 628 — 1877, chap. 444.*

By chapter 628 of 1871 the legislature authorized the laying out of a public square or place in the upper part of the city of New York for use as a military parade ground. Proceedings were instituted under this act to acquire title to the land described therein, which were continued until 1877, when they were discontinued, the legislature having in that year repealed the act of 1871, by chapter 444 of 1877. While the proceedings were pending the property owners had vainly sought to compel a completion of the improvement. The act of 1877 provided for the appointment of commissioners to estimate and determine the "loss and damages, legal or equitable, if any," sustained by the owners of any real estate situated within the boundaries of the plot of land laid out for a military parade ground, "arising from or by reason of the laying out of said parade ground as aforesaid, or the proceedings theretofore taken pursuant to the said act, or by reason of the repeal of said act." Upon the confirmation of the report of the commissioners the amount awarded thereby was to be and become a debt against the city of New York. The act provided that "nothing herein contained shall be construed to legalize, confirm or recognize as valid or equitable any claim or claims hereinbefore mentioned; but the legality or equity of any and all such claims shall be determined by said commissioners and by the court upon the hearing of their report."

Upon an appeal from an order confirming the report made by the commissioners:

*Held*, that under the act the commissioners were not limited in awarding the damages to such as were recoverable in an action at law, but were free to compensate those who had really suffered loss by what had been done under legislative authority, and to award such compensation upon fair and just principles.

That it was the duty of the court in reviewing the action of the commissioners to consider the legality or equity of each claim, and decide as to the propriety of allowing or rejecting it generally.

That any error in matter of principle committed by the commissioners in estimating the amount of the damages should also be reviewed and corrected by the court, but that, with that exception, their decision as to the amount of damages to be allowed in any particular case, made upon conflicting proofs, was final.

The act of 1871 directed that maps showing the location and extent of the public square or place, streets and avenues authorized by it, should be made, certified and filed as therein provided, and that "from and after the time of filing of said maps the said public square or place, and the streets and avenues so laid out, if any, bounding the same, shall become and be one of the public squares or places and public streets and avenues in said city." The maps required by the act were made and filed on April 5, 1873.

*Held*, that under the act the amount which the owners of the property to be taken would have been entitled to receive had the proceeding been carried to completion would have been the value of the property at the time of the filing of the map, and not its value at the time of the making of the award.

That although theoretically the owners of the property had the right at any time prior to the making of the award to convey the absolute fee, subject to the proceedings for its condemnation, yet practically they could convey only a chose in action, that is, their right to the award, which could be neither increased or diminished.

That it was the duty of the commissioners to allow to the property owners as damages the difference between the market value of the property at the time the maps were filed and its market value at the time the act authorizing the improvement to be made was repealed.

That as it appeared that the market value of the property at the time of the filing of the map in April, 1873, was largely made up of an appreciation caused by the selection of the ground as a site for the parade ground in the previous October, this appreciation should be deducted from the market value of the land at the time of the filing of the map.

That no allowance should be made for the taxes paid by the owners from 1873 to 1877.

That nominal damages only should be allowed, unless actual injuries were affirmatively shown, and that nothing should be allowed beyond the actual losses, shown to have been sustained otherwise than by the rise and fall of the general market for real estate. (Per Davis, P. J.)

The act of 1871, provided that "all streets or avenues now laid out within the limits of the said public square or place so laid out shall from thenceforth become

abandoned and closed." Within the plot of ground designated upon the map filed in 1873 were certain streets and avenues, none of which had been actually opened. Some of these had been regularly laid out by the city authorities. In other cases the preliminary steps had been taken, but the final maps had not been filed. In others the streets had been dedicated to the use of the adjoining lot owners and the public by the owners of the fee.

*Held*, that as the streets which had been duly laid out were closed by the act of 1871, and not reopened by its repeal in 1877, the owners of lands fronting upon them were entitled to some measure of compensation therefor.

*It seems*, however, that they were only entitled to nominal damages.

That for the closing of the streets which had not been completely laid out no damages should be allowed.

That the streets which were dedicated by the owners of the fee were not closed by the filing of the map, as they could not be closed until the legal title thereto had been duly acquired and compensation made therefor to the owner.

That the owners of lots fronting thereon had, therefore, no right to recover any damages for what had been done in regard to such streets.

APPEAL from an order made at Special Term confirming the report of Hon. William H. Wickham and Messrs. William C. Traphagen and Bernard Smyth, commissioners appointed to estimate and determine the damages sustained by certain property owners, by reason of proceedings to lay out a military parade ground under the act specified in the title.

The act authorizing the laying out of the parade ground, chapter 628 of 1871, provided, among other things, that certain maps should be made, certified and filed as therein directed, and that "from and after the time of filing of said maps the said public square or place, and the streets and avenues so laid out, if any, bounding the same, shall become and be one of the public squares or places and public streets and avenues in said city. * * * All streets or avenues now laid out within the limits of the said public square or place so laid out shall from thenceforth become abandoned and closed."

The act repealing this act, chapter 444 of 1877, provided, among other things, that the court should, upon notice to the corporation counsel " and all persons claiming to be entitled, as the owners of any real estate situated within such boundaries, to any compensation for loss or damage arising from, or by reason of, the laying out of said parade ground as aforesaid, or the proceedings heretofore taken pursuant to the said act, or by reason of the repeal of said act," appoint commissioners "to estimate and determine such loss and

damage, legal or equitable, if any." The amount stated in their report, when confirmed, was made a debt against the city of New York. The act further provided that "nothing herein contained shall be construed to legalize, confirm or recognize as valid or equitable any claim or claims hereinbefore mentioned; but the legality or equity of any and all such claims shall be determined by said commissioners and by the court upon the hearing of their report."

*Theodore W. Dwight, Lockwood & Crosby, Gratz Nathan, John C. Shaw, Whitehead & Hoyt, Morrison & Sigerson,* for the appellants.

*William C. Whitney,* corporation counsel, and *Arthur Berry,* for the respondents.

BARRETT, J.:

In 1871 the legislature authorized the laying out of a public square or place in the upper part of the city for use as a military parade ground. (Laws 1871, chap. 628.) Under this authority the proper officers located the contemplated improvement upon the low ground north of Fort George, and in due time the maps required by law were filed in the departments of parks and public works. The laying out was thus completed on the 5th day of April, 1873. Proceedings were subsequently taken to acquire title to the land. These proceedings underwent various vicissitudes, not now necessary to detail, until the month of June, 1877, when the legislature having repealed the entire act of 1871, they were finally discontinued. Provision was made in this latter act for a commission to appraise and estimate the loss or damage sustained by the owners of any real estate situated within the map boundaries, by reason of the laying out of the parade ground, or the proceedings taken under the act of 1871, or by reason of the repeal of that act. This commission was appointed, and after taking a large amount of testimony and hearing the parties in interest, it reported against the property owners, holding in substance that they had suffered *no loss or damage* by what had transpired.

This report was sent back to the commissioners by Mr. Justice BRADY with instructions to allow the claimants the amount of the taxes paid by them, or for which they were liable, during the period

between the completion of the laying out (by the filing of the map on the 5th of April, 1873) and the repeal (on June 15, 1877) of the act of 1871. The commissioners obeyed these instructions and again reported. This report also was sent back by Mr. Justice DANIELS, with instructions to include in the tax remission not only the land within the limits of the parade ground proper, but also that in the surrounding streets and avenues. This was done and the report was then confirmed. From such confirmation the property owners — dissatisfied with the mere tax remission and claiming more substantial relief — appeal.

The first questions to be examined are the duties under the act, of (1) the commission, and (2) the court in review of the commission.

First as to the commission.

This involves a general consideration of the subject. It is not denied that but for the act of 1877 the claimants would be remediless. Under the decisions in this State, individual rights have been subordinated to the public convenience. In England, personal rights have been more jealously guarded by the courts. There the public authorities are not permitted to play fast and loose with property owners. They cannot, at their pleasure, discontinue proceedings for the condemnation of lands which have gone so far as to bind the owners, but may be required *by mandamus* to complete them. (*King* v. *Commissioners*, 4 B. & Ad., 335; *King* v. *Hungerford Market Co.*, Id., 327.)

That this is the natural justice of the thing was recognized *In the Matter of the Commissioners of Washington Park* (56 N. Y., 148). " There is a strong equity in the claim made by the appellants," says RAPALLO, J., " that the election to take their property when once exercised in such manner as to bind the owners, should be equally binding upon those who are empowered and elect to take it ; and that the owners should not be exposed to repeated applications for this purpose, which might result, not only in keeping them in perpetual suspense as to their ownership, but might enable the other party to abuse the power intrusted to it by repeatedly making and withdrawing applications until it should obtain an appraisal satisfactory to itself, and thus deprive the owners of that just compensation for their property which is guaranteed to them by the Constitution of the State."

The second section of the act of 1877 was undoubtedly intended as a measure of relief to the property owners. For upwards of four years they had been practically kept in " suspense as to their ownership." Proceedings to acquire title had been instituted and then discontinued, recommenced and then dismissed, again set in motion and then left in abeyance, until the repeal of the act of 1871 and the final discontinuance. They had sought in vain to compel the completion of the improvement, the courts holding that the department had power to discontinue the proceedings at any time before the confirmation of the assessment. (*Matter of Military Parade Ground*, 60 N. Y., 319.) Under such circumstances, the legislative sense of justice was naturally aroused. The delays, the uncertainties, the seeming caprices to which these property owners had been thus subjected, naturally pleaded with the legislature for something like the normal measure of justice which would have been awarded in England as, of course, without special act of parliament.

It is clear that the intention was to take this particular and somewhat extraordinary case out of the ordinary rule in this State, which, notwithstanding the " strong equity " to which RAPALLO, J., referred, leaves the property owner without power to compel the authorities either to proceed, take and pay for his property, or, upon discontinuance, to compensate him for the practical impounding of his rights. If this was not intended, the act was delusive and meaningless. The legislature knew the state of our law. It was aware that the property owners had no general redress. The machinery of a commission was surely not provided merely that the commissioners might tell the property owners what they already knew, namely, that their claims were without legal foundation. No, the spirit of the act is broad and remedial. While the legislature itself carefully avoided legalizing or even recognizing as equitable any claim provable under the act, it yet authorized the legality or *equity* " of any and all such claims to be determined by the commissioners and by the court upon the hearing of their report." It thus left both commissioners and court free to do equity and justice in the premises, to compensate those who had really suffered loss by what had transpired under legislative authority, and to award such compensation upon fair and just principles.

This then was the duty of the commissioners. What is the duty of the court? Upon this head we are hardly inclined to agree with either side. We neither deem it to be our duty under the act to review each award upon the facts, nor do we feel bound by the negative finding which has been submitted by the commissioners.

The court should consider the legality or equity of each claim, and review the ruling of the commissioners thereon. We refer to the inherent character of the claim — to its allowance or rejection generally. As to the *quantum* of damages, it is the commissioners, not the court, who are to "appraise, estimate and determine." Their judgment, upon conflicting proofs, is of course final. But the court will review and correct them even in this regard where they err in matter of principle. It is for the court to settle the true rule which should guide in estimating the damages, and for the commissioners to apply such rule fairly and justly to the facts developed before them. Did the commissioners then err in matter of principle?

It will be observed that in rejecting as they have all the claims which were presented, they have planted themselves not upon conflicting evidence as to depreciation, but upon certain guiding principles, which disposed of the claims adversely, independent of such evidence. The correctness of these principles is therefore before us for review. We find a full statement of them in the report of the commissioners, and we cannot do better than to quote this statement here *in extenso*. It is as follows:

"The main proof made by the claimants was for the purpose of showing the great depreciation in this property, between the time when the map was filed in April, 1873, and the date of the repeal of the act, June, 1877, the theory of the claimants being that the filing of the map which indicated that the property would be taken by the public, tied up the property so that they were unable to sell it, and that but for the map they might have realized upon the property at the high prices which ruled in 1873.

"The corporation counsel has shown, by the decision of the Court of Appeals (60 N. Y., 320), that the filing of the map did not affect the title of the property. It was still in the owner, with full power of alienating as before. He could sell, transfer or mortgage, after the map was filed, just as before.

"But the claimants say that, though they had the legal power, the filing of the map damaged the property so in the market that they were unable to sell; they say in substance, but for the filing of the map, we might have sold out at the high prices of 1873, and therefore the city should make it up to us.

"We are agreed in the view that we are not at liberty to award damages under this statute upon any surmise of our own as to what these persons might have done with their property, unless we find, as matter of fact, that they would have done something which they were prevented from doing by the filing of the map.

"It is not enough, in our opinion, for us to see that these property owners *might have sold*, and would have sold if they had been wise and had foreseen the decline in prices which was impending; but we must find, in order to justify us in awarding damages, that they would have sold in fact if they had not been prevented by the filing of the map.

"There must be the relation of cause and effect between the act complained of and the damage claimed to result from it, in order to justify our finding damages against the city.

"We think there is no proof laid before us of any case of prevention; no property owner there has stated before us the facts necessary to justify such a finding by us.

"We cannot assume without proof that the failure to sell by these property owners was due to this rather than some other cause, if they were holding the property as an investment.

"If they expected higher prices in the immediate future; if they believed that the taking of this eighty acres out of the market and establishing there a parade ground was of itself likely to increase the value of the property in the market, which increased valuation the city would have to pay when it finally took the property; if they deemed the city likely to be a liberal purchaser, and that they were likely to realize more from the city than from a sale in the market.

"Either one of these things may have influenced them not to desire to sell, and we are agreed in the opinion that we have got to say that a man would have sold but for this act complained of, in order to justify us in finding that it was this act which prevented the sale."

We are unable to concur in this reasoning. If correct, it com-

pletely neutralizes the act. It substantially asks the claimants to prove the impossible. It is based upon an inaccurate idea of the relation of the. award to the time when the city "finally took the property." It overlooks the true position of the owner. It ignores the practical though not theoretical suspension of the right of alienation, and, upon the theory of the proceedings going through, it fails to consider the legal fixity of value (pending the suspension) which resulted from the filing of the map.

Let us look for a moment at the real *status* of a property owner pending these proceedings.

Upon the filing of the map, on the 5th day of April, 1873, the laying out of the parade ground, under the act of 1871, was completed.

From and after that date the land embraced within the map boundaries *became* and *was* (subject, of course, to the acquisition of the title to the property under the exercise of the right of eminent domain) "one of the public squares or places" of the city. There was nothing to justify even a doubt of the ripening of the proceedings into full fruition. What then was there to convey? In theory of law, the absolute fee subject to legal condemnation. But practically a chose in action — the contemplated award.

This was substantially all that the property owner had to offer to the public. Let us suppose that the owner had attempted to do what the commissioners have thrown out his claim for not doing. If he were an honest man, acting in good faith, what must he have said to a person proposing to purchase: "I have here a lot of which it is true I can give you the fee, but I cannot give you all which that usually implies. If the city completes the proceedings which have been commenced by the filing of the maps, the lot will be condemned and you will have to be contented with a money award. Until that is determined you will not be in a position to improve the lot, because the city will not be bound to allow you for any such improvements made after the filing of the map. If perchance the proceedings shall ultimately be discontinued and the land released from the effect of the filing of the map, you will then be free to improve the lot or sell it at a price which will have no relation to a fixed award."

Thus the practical limitations upon the free disposition of the

property consisted of the enforced suspension of improvements, and the uncertainty as to whether the city would ultimately take; in effect whether the vendee would secure a fixed award or, at some future and indefinite time, free land. With such a state of things the evidence could not fail to show *as it did*, that the property was *unmarketable* and *unsalable.* It would have been insensate as well as futile for the owners to have gone about hawking such uncer- tainties. * And their right to compensation under the act of 1877, cannot be made to depend upon the chance of their having dis- covered some business oddity willing to deal in specialties or peculiarities.

We have said that the commissioners failed to consider the legal fixity of value which resulted from the filing of the map. And this we conceive to be a very important consideration. For the commissioners speak, as we have seen, of a possible speculation in the awards.

If, however, the owners did not hold and, indeed, could not have held their property because of any such consideration, if in fact they were necessarily compelled to hold, because in truth they had practically nothing to sell save an award *which could neither be increased nor diminished by time*; surely that is the end of the reasoning based upon the possible expectation (by the owners) of higher prices in the immediate future. It also closes the discussion as to the necessity of proof that, as matter of fact, the owners *would have sold*, if they had not been prevented by the filing of the map.

We have carefully considered this question, and, in our judgment, it was the value of the property at the time of the filing of the map, which would have governed in the making of the award.

The taking of the city under the right of eminent domain clearly related back to the laying out of the improvement. In fact, as we have already seen, the act provided that "from and after the time of filing of said maps, the said public place or square and the streets and avenues so laid out, if any, bounding the same, *shall become and be* one of the public squares or places, and public streets and avenues of said city. (Laws 1871, chap. 628, § 2.) It is true that property owners were not absolutely divested of the fee until the confirmation of the assessments, under proceedings to

acquire title. But the real taking was none the less upon the filing of the map. The hand of the law was then placed upon the property.

From that moment it was impounded for the public use. The owner might of course use the property until formally divested of his title, but he could make no improvements for which compensation would be afforded, and even his use would be hampered by the uncertainty as to the moment of actual dispossession. The only reason why the title did not at once vest in the city was, because of the delay in making just compensation necessitated by the forms of law.

If the property owner is to suffer from depreciation, pending the proceedings to settle his compensation, so must the city from appreciation. And with what show of justice could the property owner claim the increased value caused, perhaps, by the very improvements for which the property was taken ? (See *Giesy* v. *C. W. and Z. R. R. Co.*, 4 Ohio State, 308, 322.)

The authorities too support this principle. Those in this State which are cited by the learned corporation counsel are not in point. We refer to the following : *Matter of Albany Street* (11 Wend., 153); *Wyman* v. *The Mayor* (Id., 486); *Matter of Furman Street* (17 id., 649); *Matter of William and Anthony Streets* (19 id., 678); *Matter of John and Cherry Streets* (Id., 659). In none of these did the question arise *with respect to a special improvement in the immediate present*, and there is nothing in even the isolated and incidental remarks which have been quoted in the brief, to support the proposition that " just compensation " in a case like this (had the proceedings gone through) would have been " the market value of the land at the time the commissioners of estimate and assessment made their report."

A mere outline of future improvements of a general character, having reference to the growth and ultimate needs of a great city, whatever form it may take, stands upon an entirely different footing.

Take, for instance, the case of Bloomingdale square, referred to *In the Matter of Widening Wall Street* (17 Barb., 639). It was there contended that the owners of the square were only to have the value of the lands (with interest), " as of the year 1807 when the act for laying out the city was passed, or as of the year 1811 at the latest, *when the map laying out the plan of the city was filed.*"

But the court very properly held (upwards of forty years having elapsed from the filing of the map) that the owner " was to have the enhanced value which his property had derived from *the permanent plan and settlement of the city.*" The same rule would naturally apply to the opening of streets and avenues from time to time (under a general system) as the development and progress of the city require. There, neither the system nor the procedure for " laying out " under it has any direct or immediate bearing upon the property formally condemned.

It is only when proceedings *to open* streets or avenues, and to acquire title thereto are actually begun that any perceptible influence upon values is apparent. Up to that moment the question of appreciation or depreciation is in the domain of natural conditions. But these considerations do not apply to a special improvement justified (in the legislative wisdom) by present needs, and calling for speedy development. But while no case in this State directly in point has been cited, the authorities in other States seem to be clear and explicit in favor of the doctrine that the market value at the time of the location of the improvement should govern. ( *Whitman* v. *Boston and Maine R. R. Co.*, 7 Allen, 326 ; *Edmands* v. *City of Boston*, 108 Mass., 535 ; *Hampden Paint and Chemical Co.* v. *Springfield, Athol and N. R. R. Co.*, 124 id., 119 ; *Old Colony R. R. Co.* v. *Miller*, 125 id., 3 ; *Lafayette R. R. Co.* v. *Murdock*, 68 Ind., 137 ; *Bangor and P. R. R. Co.* v. *McComb*, 60 Me., 290 ; *Delaware, L. and W. Co.* v. *Bunson*, 61 Penn. St., 309 ; *Parks* v. *City of Boston*, 15 Pick., 198 ; *Dickenson* v. *Fitchburg*, 13 Gray, 546.) It is true that some of these cases were against private or but *quasi* public corporations. Others, however, were against municipal or strictly public bodies. But the same governing principle was laid down in the one class as in the other.

" The filing of the location," said the court in *Hampden Paint and Chemical Company* v. *Springfield, Athol and Northampton Railroad Company*, " *constitutes the taking.*" So in *Whitman* v. *Boston and Maine Railroad Company*, the court observed : " In estimating the damages sustained by the petitioners the jury were properly advised to consider the value of the land and of the easement connected with it at *the date of the location* by the respondents of their road over it."

In *Old Colony Railroad Company* v. *Miller* the rule was reiterated, " damages are assessable as of the time of the location." The same rule was laid down in the Indiana case, namely, " that the damages, if any, should relate to the time of the filing of the act of appropriation."

In *Edmands* v. *The City of Boston* the court upheld the ruling of the court below that in the apportionment of the damages, as between the owner and his lessee, the latter should be allowed " the market value of his lease *at the time of the passing of the order to take the land,* deducting the market value of the occupation which he actually enjoyed *until the land was entered on.*" And in *Parks* v. *The City of Boston,* Chief Justice SHAW said : This proceeding (for acquiring the title) " is not, strictly speaking, an action for damages, but rather a valuation or appraisement of an incumbrance created on the plaintiff's estate for the use of the public. It is the purchase of a public easement, the consideration of which is settled by such appraisement only because the parties are unable to agree upon it. The true rule would be, as in the case of other purchases, that the price is due and *ought* to be paid at the moment that the purchase is made when credit is not specially agreed on. And if a '*pie-poudre*' court could be called on the instant and on the spot the true rule of justice for the public would be to pay the compensation with one hand while they apply the ax with the other; and this rule is departed from only because some time is necessary, by the forms of law, to conduct the inquiry."

The time of the location also governs in assessing the benefit conferred by the improvement upon adjoining land. (See *Meacham* v. *Fitchburg R. R. Co.,* 4 Cush., 291, 299.)

It being quite clear then that the award would necessarily have been predicated of the market value of the condemned property at the time of the location — that is, of the filing of the map — there was no basis for speculation. Compensation was not dependent upon subsequent fluctuation.

The city's obligation and the owner's rights were in principle fixed and settled. Practically the owner had nothing to transfer save, as was said in *Spears* v. *The Mayor* (87 N. Y., 359), the " right to compensation " which was " a mere chose in action " a right to the market value of his land on the 5th day of April, 1873, *neither more*

*nor less.* And his transferee would have been entitled to precisely the same compensation, *neither more nor less.* There was nothing then to speculate about, unless it were the bare possibility of the entire abandoment of the improvement, and the ultimate freedom of the land from the condemnation proceedings. This was something which neither the owners nor the public had any reason to contemplate, and it would have been the height of absurdity to have offered such a possibility for sale in the real estate market. We are therefore of opinion that the commissioners erred in the principle upon which they rejected these claims, and that it is our duty to send the report back, with instructions as to the principle which should govern in their reconsideration.

What then is the true principle upon which compensation should now be made under this act of 1877?

On the the 5th day of April, 1873, these claimants owned certain property of a certain market value. From that day down to the 15th of June, 1877, it remained on their hands unmarketable and unsalable. In theory they could convey the fee; in practice they could not. In theory they could use the land; in practice they could not. For, as was said by WILLES, J., in *Morgan* v. *Metropolitan Railroad Company* (L. R., 3 C. P., 558), " they cannot use it because they are expecting the company (here the city) to take it." Or, as BYLES, J., observed in *Fotherby* v. *Metropolitan Railroad Company,* (L. R., 2 C. P., 188): " The owner cannot tell \* \* \* in what way to use his land; whether to treat it as his own or to leave it for the company (here the city) to take possession of." In neither theory nor practice could they improve their property. Upon the 5th of April, 1873, the city took the land. It was then impounded and substantially sequestrated to the public use. It then *became and was,* in the language of the statute, a public place. It was so taken and it became such public place with the city's implied agreement (upon its proceeding to complete the improvement) to pay the owner the fair market value of the property upon the day it was so taken and became such public place. From that moment until the final discontinuance, the owner was powerless to extricate himself from the position in which the law had placed him. He was bound hand and foot, was compelled to witness the depreciation of his property without a struggle, and was

forced to rely upon the hope of a fair and just award, even that being involved in the uncertainty of a possible discontinuance without redress. Now, if this law of 1877 means anything, it means that the city shall pay for this depreciation. Clearly such depreciation is the loss and damage which the owners have sustained. The city practically took their property away from them when it had one market value. It returned it to them when it had another and lower market value. Under an act which left it to the commissioners and the court to do " equity " in the matter, the difference is the fair and just measure of compensation.

We do not pretend to support this conclusion by reference to precedents. For the case is *sui generis* and naturally no authority can be found which is precisely in point. We have resorted to the general analogies of the law; not to any special analogies derivable from particular classes of actions. Any attempt to work out a precise rule from the governing principle as to the damages in any special form of action, would be unprofitable and futile. The case is exceptional and must be exceptionally treated.

But we are not unmindful of the fact that the market value of this property, upon the 5th of April, 1873, was largely made up of the appreciation caused by the selection of the ground in the previous October. Upon this head the commissioners report as follows :

" The proof shows that between October, 1872, when this selection was made of this ground, and the map of it reported to the park department, and April, 1873, when the map was filed, finally establishing its location, the property both in and around the parade ground made a rapid rise in the market, ranging in individual cases, from fifty to one hundred and fifty per cent of increase.

" Now, as the claimants appeal to natural justice, they must accept it in all its ramifications. It is natural justice to allow the real loss which the claimants have sustained by reason of *all* that has transpired. But to arrive at this, the improvement and all that sprang from it, whether by way of appreciation or depreciation, must be entirely eliminated. It will not do, while allowing the depreciation, to ignore the appreciation *which resulted from the improvement.* For the purpose of estimating the true damage, the appreciation

caused by the proposed improvement should be deducted from the market value of the land at the date of the filing of the map.

"All over that represented the improvement and the depreciation on that should not be considered. The legislature never meant to compensate these claimants for the depreciation *upon the inflation* caused by the improvement itself. To illustrate. A. owns a lot in this locality in October, 1872. Its market value is then $500. Upon the selection of this site for a parade ground, there is a "rapid rise" until in April, 1873, the lot is worth $1,000. Upon the final discontinuance of the proceedings in June, 1877, the lot is worth $250. The " equity " or "natural justice" of the case would be an allowance not of $750, but of $250. There may be instances of intermediate purchases upon the rising market, where the rule would not fully apply, but we are not informed in that regard, and the details of the application of our general views to special cases may well be left to the good judgment of the commissioners. We ought to add, that from any compensation hereafter made under the principles now enunciated, the sums already allowed upon the tax remission must be deducted. The claimants cannot have both the true measure of depreciation, and also freedom from taxation. The latter was granted only because it was supposed that the former could not be.

We now come to the other branch of the case, namely, the claims of damages by reason of the closing of certain streets within the parade ground. These may be divided into three classes :

(1.) Tenth avenue.

(2.) Other streets claimed to have been laid out by the department of public parks.

(3.) Streets dedicated by the Dyckman estate.

The claim as to all these classes is that the streets laid out or dedicated were permanently closed by the filing of the map under the act of 1871, and that the land upon the abandonment of the proceedings did not revert to the owners, as land intersected by streets, but as mere farm land. For this damages were also claimed. It is conceded that none of these streets were actually opened. It is admitted that Tenth avenue was duly laid out, and that it at least was permanently closed by the filing of the parade ground map. It would seem, therefore, that the owners of land upon Tenth avenue

were entitled to some measure of compensation. It would naturally be slight, however, and we do not mean to intimate that an award of even nominal damages upon that account would have been disapproved.

As to the other streets said to have been laid out by the department of parks, we entirely agree with the finding of the commissioners that such streets were never legally laid out or established. They were partially surveyed, and a preliminary or sketch map was made and adopted by the commissioners. But this was wholly insufficient to constitute a legal laying out under chapter 565 of the Laws of 1865. The fair construction of this act requires the certifying and filing of three proper maps or surveys showing the width, location, course, winding and grades of such streets, accompanied with such field notes and explanatory remarks as the nature of the subject may require. These maps are required by the second section of this act to be duly acknowledged before a person authorized by law to take acknowledgments of deeds and conveyances. They are then to be filed, " one in the office of the secretary of State to remain of record, one in the office of the register of the city and county of New York, and one in the office of the Central Park commissioners." These maps were never certified, acknowledged or filed. Such certifying and filing are the acts which constitute the " laying out." All preceding acts simply evince *an intention* to lay out, which may be changed at any time prior to the act of filing.

As to the streets which were dedicated, we are of opinion that they were not closed by the filing of the parade ground map. The construction given by the Court of Appeals to the act of 1871, with regard to the parade ground proper, is equally applicable to these streets. (60 N. Y., 323.) MILLER, J., there said, speaking of the language which we have already quoted (namely, that upon the filing of the maps, the said public square or place *shall become and be* one of the public squares or places, etc.), that it " did not mean that this was to be done without regard to the usual forms of law prescribed for establishing a public park." And again he said: " The exercise of the right of eminent domain is not authorized under the constitution (art. 1, § 7) without compensation to the owner; and it cannot, I think, be contended, legitimately, because

the legislature has provided for establishing a public park, that this has been done without complying with certain provisions of law which have never been carried into effect."

The language of the act with reference to the streets is as follows:

" All streets and avenues now laid out within the limits of the said public square or place, so laid out, shall from thenceforth become abandoned and closed." Quite similar it will be perceived, to the language with regard to the effect of the filing of the map of the parade ground proper, and evidently used as incidental to the main purpose. It is, we think, entirely clear that there was no intention to close these streets until title had been duly acquired, and compensation awarded for the land.

We need not consider the precise relations of the original dedicator to his vendees, nor the question as to who was entitled to compensation.

It is sufficient for our present purposes that the fee of these streets not being in the city, they could only be closed and appropriated as a part of the parade ground, under the exercise of the right of eminent domain. And this is undoubtedly what the legislature intended, especially as the closing of the streets was but an incident in the general appropriation of the land for the purposes of the parade ground. In our judgment, therefore, the owners of lots facing upon these streets have no just cause of complaint in this regard. The streets were never legally closed or appropriated to the public use, and upon the repeal of the act of 1871, the owners found themselves in the same position with regard to these streets as they were in before its passage.

We concur in the conclusions arrived at by the commissioners upon all these questions respecting the closing of streets (except as to Tenth avenue), and are satisfied that no claim for damages upon that head has been made out.

We also think that the ruling of the court below upon the subject of costs was correct. The amount awarded to the commissioners for their very onerous labors was only reasonable. Their duties were responsible and difficult. We know how laborious has been the task of reviewing their proceedings, and we can easily see how much greater must have been their labors as a *quasi* tribunal of first

instance. The amount allowed by the act of 1877 for the costs and expenses of the proceedings having been exhausted, we apprehend that further legislative provision will have to be made before these commissioners can be expected to recommence their labors.

That, however, has nothing to do with our present conclusion upon this head, which is that the order as to the costs should be affirmed. The order confirming the commissioners' report must however, be reversed and the report sent back to the commissioners, with instructions to take such further proofs as may be offered by either side, and to estimate and determine the damages, if any, sustained by the claimants upon the principles stated in this opinion.

DAVIS, P. J. :

In concurring in the conclusions reached by my brother BARRETT, I desire to say that I do not understand his views as going any farther than to show that at most mere nominal damages can be allowed when actual injuries are not affirmatively shown, or, in other words, that speculative damages are not allowable, and nothing beyond actual losses shown to have been sustained otherwise than by the rise and fall of the general market for real estate. As to Tenth avenue, claims nothing beyond nominal damages can be asserted for the abandonment of the proceedings and of the highway.

The discretion of the commissioners should be most carefully exercised, otherwise great damage to the city may be done by awarding damages when none have been in fact sustained, and especially " farm lands " should not be subdivided into ' lots ' for the purpose of sustaining exaggerated claims, nor any other mode tolerated of making the property appear otherwise than what it was, and would doubtless have remained if the project of a " parade ground " had not been contemplated.

The door into the public treasury opened by the repealing act is one which by erroneous construction may let in such a horde of fraudulent claims that I feel justified in adding these suggestions to the extremely able opinion of my brother BARRETT.

Present — DAVIS, P. J., and BARRETT, J.

Order reversed ; order to be settled by BARRETT, J.